HOUSTON OIL CO. OF TEXAS v. STEPNEY et al. (No. 45.)*

(Court of Civil Appeals of Texas. Beaumont. May 11, 1916. Rehearing Denied July 3, 1916.)

1. ADVERSE POSSESSION ⊝═85(2) — HOSTILE POSSESSION.

On the issue of title by adverse possession the material point of inquiry is whether claimant has actually claimed adversely to the owner, and it is not material whether his claim would have been different if his knowledge of the title had been more correct.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 501–503; Dec. Dig. ⊝═ 85(2).]

2. APPEAL AND ERROR ⊝═1058(2)—HARMLESS ERROR—CONVERSATION WITH DECEASED.

In trespass to try title defendants claiming by adverse possession, excluding evidence of instructions by plaintiff's deceased grantor to his agent to allow defendants to occupy the land permissively, was not error, where witness was permitted to testify that under such instructions he had permitted defendants to remain on the premises without paying rent, and that one defendant had told witness he was holding possession under such an arrangement.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4195, 4201; Dec. Dig. ⊝═ 1058(2).]

3. ADVERSE POSSESSION ⊝═115(1)—QUESTION FOR JURY—DURATION AND CONTINUITY OF POSSESSION.

In such action evidence of occupation by defendants and their predecessors, and conflicting evidence as to interruption thereof *held* not to warrant peremptory instruction for plaintiff.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 691, 701; Dec. Dig. ⊝═ 115(1).]

4. ADVERSE POSSESSION ⊝═100(1)—CONSTRUCTIVE POSSESSION.

The rule that possession by the true owner of a part of a tract gives constructive possession of all not actually adversely held does not apply where the true owner cuts logs from land which are sold him by the adverse occupant.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 547; Dec. Dig. ⊝═100(1).]

5. ADVERSE POSSESSION ⊝═116(5)—INSTRUCTIONS.

In trespass to try title, defendant claiming by adverse possession, a charge that "adverse possession is a claim inconsistent with and hostile to the claim of another," was not misleading as suggesting that defendants' possession could be adverse, although against "another" than the owner, where the court also submitted the direct question whether defendants did in fact claim adversely to the true owner, naming him, and the jury answered in the affirmative.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 66; Dec. Dig. ⊝═116(5).]

6. ADVERSE POSSESSION ⊝═70—"CLAIM OF RIGHT."

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 5681, defining adverse possession as actual and visible appropriation of the land, commenced and continued under a "claim of right" inconsistent with and hostile to the claim of another, entry under "claim of right" simply means an entry not subordinate to another's title, but with claim of right to the land, hostile and adverse to the true owner, although the person so entering knows he has no title except such as possession may confer.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 394–414; Dec. Dig. ⊝═ 70.

For other definitions, see Words and Phrases, First and Second Series, Claim of Right.]

7. ADVERSE POSSESSION ⊝═68 — "COLOR OF TITLE."

Color of title, by which is meant that which has the semblance or appearance of title, legal or equitable, but which is in fact no title, is not necessary to perfect title by adverse possession, in the absence of statutory provisions expressly or by clear implication requiring it.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 387–393; Dec. Dig. ⊝═ 68.

For other definitions, see Words and Phrases, First and Second Series, Color of Title.]

8. ADVERSE POSSESSION ⬤═12 — CLAIM OF RIGHT.

Claim of title or claim of right by the occupant is necessary in all cases where title is established by adverse possession.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 65, 387–393; Dec. Dig. ⬤═12.]

9. ADVERSE POSSESSION ⬤═11—HOSTILE POSSESSION.

No matter how exclusive and hostile to the true owner the possession may be in appearance, it cannot be adverse unless accompanied by the intent of the occupant to make it so.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 67–76; Dec. Dig. ⬤═ 11.]

10. ADVERSE POSSESSION ⬤═68 — CLAIM OF RIGHT—LENGTH OF CLAIM.

Entry and possession without a claim of right is nothing more than a trespass, and can never ripen into good title, no matter how long continued.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 387–393; Dec. Dig. ⬤═ 68.]

11. ADVERSE POSSESSION ⬤═31—ELEMENTS—KNOWLEDGE OF OWNER.

In order to make a good claim by adverse holding, the true owner must have actual knowledge of the hostile claim, or the possession must be so open, visible, and notorious as to raise the presumption of notice that the rights of the true owner are invaded intentionally and with the purpose of asserting a claim of title adverse to his, so patent that the owner could not be deceived, and such that, if he remains in ignorance thereof, it is his own fault.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 128–133; Dec. Dig. ⬤═ 31.]

12. DESCENT AND DISTRIBUTION ⬤═11—REAL PROPERTY.

Where title to land has been established by limitation upon death of the occupants it descends to their heirs and becomes their separate property.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 40–44, 47, 180, 184; Dec. Dig. ⬤═11.]

13. JUDGMENT ⬤═707 — CONCLUSIVENESS — PARTIES.

A judgment is not binding upon persons not parties nor privies thereto.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1230; Dec. Dig. ⬤═707.]

14. JUDGMENT ⬤═743(2)—CONCLUSIVENESS—AFTER-ACQUIRED TITLE.

One is not estopped by a judgment that he has no title to land from setting up an after-acquired title, or a title based on the ten-year statute of limitations.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1253, 1276, 1284; Dec. Dig. ⬤═ 743(2).]

15. APPEAL AND ERROR ⬤═1062(1)—HARMLESS ERROR — SUBMISSION OF INTERROGATORY.

The submission of an interrogatory the answer to which becomes immaterial by the submission and answer of other interrogatories is harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4212; Dec. Dig. ⬤═ 1062(1).]

Appeal from District Court, Newton County; A. E. Davis, Judge.

Action by the Houston Oil Company of Texas against Demps Stepney and others.

From a judgment for defendants, plaintiff appeals. Affirmed.

Parker & Kennerly, of Houston, for appellant. Powell & Huffman, of Jasper, for appellees.

CONLEY, C. J. This suit was brought by the appellant, Houston Oil Company of Texas, as plaintiff below, against Demps Stepney and his wife, Lucy Stepney, and others, as an action of trespass to try title for recovery of a specific 160 acres of land, a part of the D. S. D. Moore league in Newton county, Tex., and for damages for cutting timber therefrom. All of the defendants filed disclaimers, except Demps Stepney and his wife, Lucy, who pleaded general denial, not guilty, and the ten-year statute of limitations.

By supplemental petition appellant alleged that during the receivership of the Houston Oil Company of Texas, to wit, on the 5th day of December, 1905, receivers in that cause filed suit against Demps Stepney in the United States Circuit Court for the Southern District of Texas, praying for the recovery of title to and the possession of the same land sued for herein, and, further, that the defendant, Demps Stepney, be enjoined from interfering with the title and possession of said receivers to said property; that said Demps Stepney filed an answer in said cause, and appeared by attorney, in which he undertook to establish title under the ten-year statute of limitations, that said receivers recovered judgment in said cause on the 28th of September, 1908, in which they were awarded title and possession of said 160 acres of land under the decree of the court duly entered, and which judgment they contend is a bar to said Demps Stepney and others claiming under him from disputing the title of the appellant in this cause.

By supplemental answer the appellees specially excepted to that part of the supplemental petition which sets up the federal court judgment as a bar: First, because said petition shows on its face that, if any judgment was obtained against Demps Stepney, the same was recovered in the United States Circuit Court for the Southern District of Texas, in the city of Houston, Harris county, Tex., in the exercise of its equity powers in the receivership against the Houston Oil Company of Texas by intervention in said original suit in equity, No. 54, brought by the Maryland Trust Company of Baltimore against the Kirby Lumber Company and the Houston Oil Company of Texas, two Texas corporations, and that said court had no jurisdiction over the person of Demps Stepney or over the land in controversy, because the receivers of the Houston Oil Company of Texas, in their intervention No. ———, against Demps Stepney, were asserting a legal title to real estate against Demps Stepney, who was in actual, adverse possession

of the land in controversy; and, second, because said receivers of the Houston Oil Company of Texas nor the Houston Oil Company of Texas were in possession of the land sued for and described in said judgment, and therefore could not entertain or maintain a suit in equity therefor; their right being one of ejectment, they had a complete and adequate remedy at law, which could be brought only in Newton County, Texas, where the land was situated, and the defendant, Demps Stepney, resided, and the said judgment is therefore void; third, because said pleadings show upon their face that Demps Stepney, one of the defendants only in this cause, was a party to said suit in the Circuit Court of the United States, and that Lucy Stepney, who was one of the defendants in this suit, was not a party to the suit in which the alleged judgment was obtained.

The defendants also further answered, denying that any citation had ever been served upon Demps Stepney or his wife in the federal court suit, nor that they or either of them ever knew that a suit was filed against them in which the alleged judgment was obtained against Demps Stepney, and that the judgment entered therein is against Demps Stepney only for land, which at the time of the filing of said suit and obtaining said judgment was, and is now, the homestead of Demps Stepney and Lucy Stepney, and that said Lucy Stepney is and was not a party to said suit and judgment, and same is therefore void. All the demurrers and exceptions were overruled.

During the trial of this cause the appellees, to avoid the effect of this judgment, and in addition to attacking it as being void for want of jurisdiction, offered testimony to prove that Levi Levias and his wife, Mary Levias, who were the father and mother of Demps Stepney's wife, Lucy Stepney, lived on the land in controversy and matured a complete limitation title to it before their death, and that consequently when they died Lucy Stepney and the other heirs (whose interest Demps Stepney and wife have acquired since the judgment in the federal court suit in 1908) inherited said land as their separate property, and that consequently the judgment against Demps Stepney alone was not binding on Lucy Stepney nor the other heirs who were not parties to that suit.

The court submitted the case upon special issues to the jury, as follows, to wit:

"Question No. 1: Have Demps Stepney and his wife, Lucy Stepney, had and held peaceable and adverse possession of the land described in their answer, cultivating, using, or enjoying the same, for ten consecutive years prior to January 16, 1914? You will answer this question 'Yes' or 'No,' as you may determine the fact to be. * * *

"Question No. 3: Did Levi Levias and wife have and hold peaceable and adverse possession of the land described in plaintiff's petition and defendants' answer, cultivating, using, or enjoying the same, for ten consecutive years prior to January 16, 1914. You will answer this question 'Yes' or 'No,' as you may determine the fact to be.

"Question No. 4: Did Demps Stepney and his wife, Lucy Stepney, live upon the land described in plaintiff's petition and in defendants' answer in peaceable and adverse possession, claiming, using, cultivating, or enjoying the same, for more than ten years consecutively before the 1st day of January, 1914? You will answer this question 'Yes' or 'No,' as you may determine the fact to be. * * *

"Question No. 6: Did Levi Levias claim the land on which they were living adversely against Judge D. R. Wingate? Answer 'Yes' or 'No.'

"Question No. 7: Did Levi Levias' wife claim the land on which she was living adversely against Judge D. R. Wingate? Answer this question 'Yes' or 'No.' "

The jury answered the questions as follows, to wit:

"Question No. 2 we answer 'Yes.'
"Question No. 3 we answer 'Yes.'
"Question No. 4 we answer 'Yes.'
"Question No. 6 we answer 'Yes.'
"Question No. 7 we answer 'Yes.' "

Upon motion of the appellees, judgment was entered in their favor on the answers of the jury to the several questions propounded to it, and from this judgment the Houston Oil Company of Texas has duly perfected an appeal.

[1] Under the first assignment of error it is contended that the court erred in refusing to let the appellant, Houston Oil Company of Texas, ask the witness Demps Stepney whether, if he had known that the land they were living on was at the time and during the early part of their claim the land of D. R. Wingate, he would have claimed it adversely against him; it having been developed by the evidence that D. R. Wingate owned the land during a part of the time limitation was running, and that Levi Levias, the father-in-law of Demps Stepney, was an old slave of Judge Wingate. The evidence shows that Levi Levias and Mary Levias moved on the land in controversy somewhere between the years 1871 and 1873, the exact date being in controversy; that Levi Levias lived on this place until his death, which is fixed by the witnesses from the year 1879 to 1889; that Mary Levias continued to live on this land until her death, which occurred some time subsequent to that of her husband, and the date of which is also in controversy, it ranging from 1886 until later years; that the land in controversy is situated principally on a 400-acre tract, and only partially on a 300-acre tract, both of which tracts belonged to Judge D. R. Wingate. The jury found from the evidence submitted to them that Levi Levias and Mary Levias, his wife, had matured limitation title to the 160 acres of land in controversy. The evidence also shows that neither Levi Levias nor Mary Levias, his wife, nor Demps Stepney, knew that Judge Wingate ever owned or claimed any of the land in controversy.

If limitation title was perfected in the heirs of Levi Levias and his wife, Mary Levias, at the date of the death of the latter, as the jury found by their verdict, it

is immaterial what Demps Stepney might have done if he had known who the .true owner was. If, as a matter of fact, Demps Stepney had claimed the land in controversy for a sufficient length of time to mature limitation title, it is quite immaterial what he would otherwise have done had his information as to the ownership of the land been different. The material point of inquiry was whether he had actually claimed the land adversely to the owner, and not whether his claim would have been different if his knowledge of the title had been more correct. The court did not err in excluding this evidence, nor in refusing to give the special requested instruction based thereon defining the meaning of "adverse possession." This assignment is therefore overruled.

[2] Under the second assignment of error the appellant complains of the action of the court in refusing to allow it to ask the witness R. P. Wingate about the instructions he had received from his father, D. R. Wingate, with reference to permitting Levi Levias and his wife, and Demps Stepney and his wife, to live on the land which they claimed, and which was part of the land owned by D. R. Wingate, deceased, and a part of the land in controversy, without requiring them to pay rent either to him or to D. R. Wingate. The record shows that this witness had testified that his father made him agent for the purpose of looking after the lands. He said that "his father charged him what to do and told him to exempt old man Levi, and not to charge him any rent or anything that way." The appellees objected to the introduction of this evidence, and the record shows that the court ruled:

"He can testify that his father put him in charge of that land to look after the land, and he can testify that he didn't collect any rents from Levi Levias, because of the instructions received, but, as to telling what was told him by his father, detailing the conversation between him and his father, I don't think it admissible, but he can tell what he did under the instructions."

There was no error in this ruling of the court, and, besides, at another place in his testimony, this witness was permitted to tell the jury, without objection, speaking of the conversation which he had with Levi Levias before his death, that:

"He (Levias) told me that Father told him he could go out on any of the land he wanted to and stay there as long as he wanted to, and he wouldn't charge him any rent for it."

This is practically the same evidence as the court excluded. There is no merit in this assignment of error, and it is overruled.

[3] Under the third assignment of error the appellant urges that the court should have given the special requested instruction to peremptorily return a verdict for the appellant—

"because the evidence failed to show ten years' adverse possession beyond the amount of land in the actual possession of the appellees, as the testimony was undisputed that the owner of the real title was logging a part of the land in controversy, which was covered by deeds to him, and consequently, by reason of such actual possession incident to the logging operations, he had constructive possession of all of the land covered by said deeds not in the actual adverse possession of the claimants."

[4] An investigation of the evidence discloses that Levi Levias and his wife went on to the 160 acres in controversy and settled a home thereon between the years 1871 and 1873; that they cleared two fields and had in cultivation about 10 acres; that they built houses, roads, and fences on said land; that they lived there until they both died, some time in the 80's, the dates of their respective deaths being heretofore referred to. Demps Stepney went to live with his father-in-law, Levi Levias, in 1878 or 1879, and after his death continued to farm a portion of the improvements for his mother-in-law, Mary Levias, until her death. After the death of his mother-in-law Demps Stepney and his wife continued to live on the land, and have claimed same until the filing of this suit in 1914. The evidence is conflicting as to the exact date Levi Levias went on the land. It varies from 1871 to 1877, and the death of old man Levi Levias is also uncertain; the dates ranging from 1879 to 1889. These were all conflicting issues ,which were settled by the special verdict in favor of appellees, in answering questions 3, 6, and 7. The evidence as to the logging operations was conflicting. While the evidence shows that Walter Wingate, acting for his father, did some small amount of logging on the 160-acre tract in controversy, yet Demps Stepney testified that he sold him the logs. While it is the rule of law that the true owner possessing a part of a tract of land shall give constructive possession of all of the land which is not in actual possession of the adverse claimant, yet, if Walter Wingate purchased the timber from Demps Stepney, and went on the land and cut the timber under such circumstances, there would not be any break in the continuity of the adverse claimant's possession, and the rule as urged by the appellant in this assignment would not apply. The evidence upon this issue was also conflicting, and was settled by the above answers of the jury to the special issues propounded to them. This assignment of error is therefore overruled.

Under the fourth assignment of error appellant contends that the court's charge on adverse possession, although abstractly correct, is misleading, in view of the fact that the court had, in the hearing of the jury, refused to permit the plaintiff to ask the defendant Demps Stepney if he ,would have claimed the land in controversy adversely to Judge Wingate if he had known that Judge Wingate had owned it, because it states "that adverse possession is a claim inconsistent with and hostile to the claim of another," whereas the charge should have stated that the possession is not adverse if the claimant does not claim the land against the person

who is at the time the real owner; that this charge as given might reasonably have impressed the jury with the idea that, though the claimant did not claim against anybody who in fact owned it, the possession was still adverse if they claimed against others.

[5] The charge as given by the court on adverse possession is a correct statement of the law, and in connection with that charge the court also submitted to the jury the direct question as to whether or not Levi Levias and Mary Levias did in fact claim the land adversely to Judge Wingate, and the jury answered in the affirmative. There is no reason, therefore, for the inference that the jury could have formed any impression that the possession of the land was adverse, within the meaning of the charge of the court, although the claimants were not holding against Judge Wingate. There is no merit in this assignment, and it is also overruled.

[6] Under the fifth assignment of error the appellant urges upon the court that the verdict of the jury and the judgment of the court thereon are unsupported by the law and the evidence, because the uncontradicted evidence shows that there "never was any entry or possession held under a claim of right" by Levi Levias or his wife, or by Demps Stepney and his wife, or by any person under whom the appellees claimed; that the only claim of right which the appellees' evidence shows ever to have been held by Levi Levias and wife was such only as might arise by reason of the bare fact of occupancy, conflicted with adverse claim, and that there was absolutely no evidence tending to show that the entry by Levi Levias and wife was made on land which he claimed to own, or that there was ever any claim of right under which the possession was held."

Since the decision by the Supreme Court in the case of Stevens v. Pedregon, 173 S. W. 210, there seems to have been created some confusion in the minds of the profession as to the correct meaning to be given the terms "under a claim of right," as contained in Vernon's Sayles' Ann. Civ. St. 1914, art. 5681, which, in defining adverse possession, contains the following language:

"Adverse possession is an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another."

The ten-year statute of limitations of 1841, which remained unchanged until 1879, when the present statute was enacted, did not specially provide that the possession should be adverse, nor was the term "adverse possession" used or defined in the statute. However, the courts, in construing that act, held that the peaceable possession provided for upon the part of the claimant of necessity must be adverse to the claim of the true owner, and not held in subordination of his title. Redding v. Redding, 15 Tex. 251; Hudson v. Wheeler, 34 Tex. 366. In the early case of Portis v. Hill, Administrator, 3 Tex.

278, Mr. Justice Wheeler defined adverse possession as "an actual visible and exclusive appropriation of the land commenced and continued under a claim of right, either under an openly avowed claim or under a constructive claim, arising from the acts and circumstances attending the appropriation, to hold the land against him who is seized." When the ten-year statute of limitations was amended in 1879, and "peaceable possession" and "adverse possession" expressly defined, the language of Mr. Justice Wheeler defining "adverse possession" was almost adopted verbatim et literatim. Since the enactment of the limitation statute in 1841, and since the amendment of 1879, there has been an unbroken line of decisions declaring that it did not matter how tortious or wrongful may have been the seizure of the adverse claimant, if possession be continued for the time required by statute, it would give title, preclusive of all claims.

In the case of Charle v. Saffold, 13 Tex. 112, Mr. Justice Hemphill said:

"It thus appears that naked possession will secure title for 640 acres, without inclosure, * * * and the circumstances under which the possession is taken are altogether immaterial to the right, provided the occupant claimed for himself and adversely to all others. No matter how tortious or wrongful may be the seizure, if possession be continued for the time limited by the statute, it will give title, preclusive of all claims. * * * The object of the statute in its longer terms is not to settle questions in relation to good or bad faith, the right or wrong of the possession; it proceeds on other principles. As said in Cholmondley v. Clinton, 2 Jac. & Walker, 155: 'A tortious act can never be the foundation of a legal any more than an equitable title. It is no more favored by a court of law than a court of equity, considered nakedly by itself, but the statute bar arises from other principles. Admitting the title, if it could be inquired into, to be clearly in favor of the plaintiff and against the defendant, still the question is whether he has prosecuted that title in time. The quiet and repose of the kingdom, the mischief arising from stale demands, the laches and neglect of the rightful holder, and all the other principles of public policy take away the remedy notwithstanding the title veri domini and the tortious holding of the possession. To advert to the merits is to shift the question from the real subject of inquiry. The case never arrived at that point; it is stopped in limine in courts of equity as of law. The title is changed in both by operation of a public law upon public principles, without regard to original private right. If the negligent owner has forever forfeited by his laches, his right to any remedy to recover, he has in effect lost his right to recover.'"

In the case of Kinney v. Vinson, 32 Tex. 126, the court said:

"The statute of limitations of ten years does not involve the question of good faith in the naked possessor. The language of the act is broad and unqualified, and the legislation was based, no doubt, upon the policy of compelling those who had a right of entry under title to take actual possession of their lands, and have the country settled at the peril of being ousted by those who would settle the land and improve the country. It is, then, a mere question of fact as to the adverse possession for that period of time."

The result of the holding of the court in the case of Craig v. Cartwright, 65 Tex. 413, was that, if one entered upon the land of another without right and erected houses and opened fields thereon, continuously occupying the house and using the fields for such purposes as the land is adapted thereto, although a trespasser, still, if this continues or be permitted by the true owner to continue for the period prescribed by the statute, without interruption, this "naked trespasser" will, under the law, lose that character, and become the owner of the land.

The case of Link v. Bland, 43 Tex. Civ. App. 519, 95 S. W. 1110, is directly in point on the issue involved under this assignment. That case was a suit by J. W. Link against Richard Bland, in trespass to try title for 640 acres of land in Orange county. The defendant, among other defenses, pleaded the statute of limitation of ten years as to 160 acres of land sued for, including his residence and improvements, the 160 acres being specifically described in his answer, and disclaimed as to the remainder of the survey. There was a verdict for the defendant as to the 160 acres. Under the first assignment of error the appellant assailed the verdict of the jury and the judgment of the court in that case on the ground "that the undisputed evidence showed that defendant's possession was not commenced or continued under a claim of right, as required by the statute." The court, in considering the question, said:

"From the evidence in the record as to the appellee's possession we deduce the following facts: The suit was begun September 8, 1904. In February, 1894, appellee, who was a married man, moved upon the section of land in controversy with his wife. He built a dwelling house with other usual improvements of a home, on the southeast quarter of the section, before moving on it, cleared land, put about 4 acres in cultivation the first year, which was afterwards increased to 10 acres in cultivation and 15 acres in pasture. He has continuously lived with his family on the land since first moving there in February, 1894, and has always claimed the land adversely to the owner and all other persons. When he first began to clear the land for his home, he thought the land was on section 22, a school section, but found out before his house was built, and before he took up his residence, that it was on section 19, and that the section belonged to the Texas & New Orleans Railway Company. Appellee's intention was to hold the land in hostility to the owner and every one else, but he testified that he had no title to the land, that he had never bought it, nor inherited it, nor had anybody ever given it to him. Knowing he had no title, he took possession claiming, and intending to claim, the land by virtue of his possession, and continued to occupy it as his home under such claim based upon his possession alone, from and after February, 1894. His possession was during all this time open and notorious, and was exclusive and hostile to the owner and all others. Appellee testified that he knew that the land was not his, and that he did not claim to own it when he first went on it; that he never asserted a better title than the Texas & New Orleans Railway Company, but his testimony shows clearly that what he meant by these expressions was that he had no title to the land, and never claimed to have any except what his naked possession gave him, and never asserted any hostile claim except such as could be predicated upon his possession. The undisputed evidence shows clearly that appellee's possession was an actual and visible appropriation of the land, adverse to all the world, and that he at all times claimed whatever right such possession gave him, without at any time claiming to be the owner of the land in the sense of having title or right except such as inhered in, and was attached to, such possession.

"Appellant's contention as to the law upon this state of facts can best be stated by the following quotations from his brief: 'The language of the statute applying to the contention of appellant in this case is plain: "Adverse possession is an actual and visible appropriation of the land commenced and continued under a claim of right inconsistent with, and hostile to the claim of another." Under this statute a man, to start the statute of limitations running, must be an honest claimant of the land he is in possession of. The statute was made to protect persons honestly claiming their property and in the possession thereof. The statute was not made nor intended to deprive the owner of land of his title thereto, at the claim of a possessor thereof in bad faith, who was occupying the land without a claim of right; in other words, knowingly, without title, and without the right of possession. There is no law in Texas that protects a naked squatter on the lands of another. His term of occupancy as a naked squatter, and knowing that he had no right to enter or hold the land, and not claiming to have any such right, would never ripen into title, and possession of this kind was never intended to ripen into title or deprive the owner of any rights of property.' Appellant lays much stress upon the provisions of article 3349, Rev. St. 1895, defining adverse possession to be 'actual and visible appropriation of the land commenced and continued under a claim of right, with, and hostile to the claim of another,' and it is strenuously insisted that the undisputed evidence shows that appellee did not enter into possession under such 'claim of right' as is here intended.

"It cannot be denied that he claimed whatever right his possession entitled him to, but it is insisted that the entry and possession must be upon at least a claim of ownership and right of possession, independently of the possession itself. We think this is a fair statement of appellant's contention. The law has clearly been settled otherwise by an unbroken line of decisions in this state. It was held by the Supreme Court in Charle v. Saffold, 13 Tex. 112: 'It thus appears that naked possession will secure title for 640 acres without inclosure, or 1,000 or 2,000 with inclosure; and the circumstances under which the possession is taken are altogether immaterial to the right, provided the occupant claims for himself and adversely to others. No matter how tortious or wrongful may be the seizure, if possession be continued for the time limited by statute, it will give title preclusive of all claims; * * * no question is made or is open relative to the bona fides or mala fides of the possession.' This doctrine has been followed in numerous cases, of which we need only cite the following: Craig v. Cartwright, 65 Tex. 421; Word v. Drouthett, 44 Tex. 369; Bruce v. Washington, 80 Tex. 372, 15 S. W. 1104; Cox v. Sherman Hotel Co., 47 S. W. 809. It is true that the statute defining adverse possession was not passed until the adoption of the Revised Code of 1879 (article 3198, Rev. St. 1879), and that of the cases cited Charle v. Saffold and Word v. Drouthett were decided prior to that date; but the statute referred to only incorporates as a part of the law the very construction placed upon the former law as to what was necessary to constitute adverse possession, as laid down in Portis v. Hill, 3 Tex. 279; Craig v. Cartwright, supra.

"There is no intimation in the evidence that

appellee held in subordination to the title of appellant or any one else. He says that he intended to hold the land until he was put off, by which is evidently meant until he was divested of possession by some one whose title was superior to whatever rights his possession gave him. Appellee was a naked possessor, but such persons are clearly within the protection of the statute, even where they take and hold possession with the intention of acquiring title by limitation to something to which they have no claim otherwise. None of the cases cited by appellant in his brief support his contention. It will be found that all of them turn upon the point that the possession has been in subordination to the title of the owner, or under circumstances which show that it was not intended to be adverse to the owner, or did not show a visible appropriation of the land. Appellee's possession gave him title to 160 acres of the land."

The language of the Supreme Court in the case of Stevens v. Pedregon must be read in the light of the facts which the court was discussing in that case. It is to be noted that the court was considering the statutory definition of adverse possession. Quoting Vernon's Sayles' Statutes, it said:

"Adverse possession is an actual and visible appropriation of the land commenced and continued under a claim of right inconsistent with and hostile to the claim of another. Article 5681."

[7-10] No matter in what jurisdiction the determination of what constitutes adverse possession may arise, the decisions and text-books are unanimous in declaring that such possession, among other things, must be hostile. Color of title (and by which we mean that which has the semblance or appearance of title, legal or equitable, but which is in fact no title) is not necessary under any of the authorities to perfect title by adverse possession, in the absence of statutory provision which expressly or by clear implication required it. 1 Cyc. 1084. However, claim of title or claim of right by the occupant is in all cases necessary. 1 Cyc. 1028. No matter how exclusive and hostile to the true owner the possession may be in appearance, it cannot be adverse unless accompanied by the intent on the part of the occupant to make it so. The naked possession unaccompanied with any claim of right will never constitute a bar. Where a party enters upon land and takes possession without a claim of right, his occupation is subservient to the paramount title, not adverse to it. It is nothing more than a trespass, and, no matter how long continued, can never ripen into a good title. Sellman v. Hardin, 58 Tex. 86; Murphy v. Welder, 58 Tex. 235; Schleicher v. Gatling, 85 Tex. 270; 1 Cyc. 1028, 1029.

[11] In order to make a good claim by adverse holding the true owner must have actual knowledge of the hostile claim, or the possession must be so open, visible, and notorious as to raise the presumption of notice that the rights of the true owner are invaded intentionally, and with the purpose of asserting a claim of title adverse to his, so patent that the owner could not be deceived,

and such that, if he remains in ignorance of, it is his own fault. 1 Cyc. 996 and 1000. This was the sense in which Mr. Justice Brown was considering the phrase "claim of right," and entry under "claim of right," as therein used, simply means an entry not in subordination of another's title, but, on the contrary, that the claimant's entry on the land and his acts and possession incident thereto are of such a character as to manifest an immediate intention and purpose to claim a right or title to the land in himself hostile and adverse to the true owner. The cases Mr. Justice Brown cites are all upon the subject of possession by claimants to land, which possession was not held sufficient to charge notice on the true owner that his land was being adversely claimed, or not sufficient to set in motion the statutory bar to the true owner's right. This conception of the meaning of the term, as used in that case, is further emphasized by subsequent language found in the same opinion, for the court specifically says:

"At no time from the first entry upon the land to the institution of this suit does defendant in error claim to have actually resided upon the land, nor to have the land or any part so inclosed, nor does he claim that at any time he had a tenant upon it for a length of time sufficient to constitute limitation under any provision of the law, or any decision of this court. Such possession as he claims to have had consisted of cultivating a small portion of the land one year at one place, and the next year at another, and some years there was no cultivation of any part of the land for the want of water. There was nothing in his acts that would indicate a claim of ownership [or, as we may say, and in the sense in which the term was used by Mr. Justice Brown, of a claim of right] to the land. All that defendant in error did in the use of the land might have been regarded as harmless trespass."

We do not think it was the intention of this case to overrule the long-established principle in this state that the good or bad faith inception of the entrance of the adverse claimant was not a subject of inquiry in the perfection of title by limitation, under the ten-year statute.

[12-14] The jury having found that title by limitation had been perfected in Levias and his wife, upon their death the land in question descended to their heirs, and became the separate property of the four daughters. The judgment in the federal court rendered against Demps Stepney, waiving the question of the jurisdiction of the federal court to render any such judgment, was not binding upon such heirs; they not being parties to that suit. The title acquired by Demps Stepney from these heirs came to him subsequent to the rendition of the judgment in that suit, and therefore he is not estopped by such judgment from pleading the after-acquired title, nor from setting up the ten-year statute of limitation as a basis of recovery affecting the 160 acres of land involved in this suit. The fifth assignment of error is therefore overruled.

The sixth assignment of error charges that

the court erred in not submitting appellant's special charge No. 1, on the subject of adverse possession, and in submitting the one the court gave. What we have said heretofore in considering the first and fourth assignments of error disposes of the questions raised hereunder, and this assignment is therefore overruled.

[15] Under the seventh assignment of error appellant urges upon us that the court erred in submitting to the jury question No. 2; they contending that any limitation title which might have matured in whole or in part during the marriage of Demps and Lucy Stepney by reason of their occupancy of said land would be community property, and that therefore the judgment against Demps Stepney alone would be sufficient, he being the head of the family, to divest both him and his wife of all title to the land in controversy. The jury having found on another issue that limitation title to the land in controversy had been perfected in Levi and Mary Levias, the father and mother of Demps Stepney's wife, and the other three heirs, the land in controversy descended to them as their separate property, and, even if there was error in the submission of question No. 2, it was harmless under the finding by the jury that limitation title had been perfected to this land by Levi Levias and his wife. This assignment of error is therefore overruled.

Having heretofore determined that the heirs of Levi and Mary Levias owned the land in dispute in their separate right at the time of the institution of the suit in the federal court against Demps Stepney, and they, not being parties to that suit, were not bound thereby, it is not necessary at this time to examine into the question affecting the jurisdiction of the federal court in said cause to render the judgment it did against Demps Stepney, even if the federal court had jurisdiction of the subject-matter of that suit, since its jurisdiction was wholly lacking over the real owners of the land.

The judgment of the trial court is therefore in all things affirmed; and it is so ordered.

⬡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes